IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| Dakota Access, LLC, ) | |
| ) | |
| Plaintiff, ) | Case No. _____ |
| ) | |
| vs. ) | |
| ) | **COMPLAINT** |
| Dave Archambault II, Jonathan Edwards, ) | |
| Dana Yellow Fat, Valerie Dawn ) | |
| Wolfnecklace, Clifton Verle Hollow, Donald ) | |
| Dennis Strickland, Aaron Gabriel Neyer, and | |
| John and Jane Does, | |
| | |
| Defendants. | |

Plaintiff Dakota Access, LLC ("Dakota Access"), by and through its counsel, Fredrikson & Byron, P.A., 1133 College Drive, Bismarck, North Dakota, for its Complaint against Defendants Dave Archambault II ("Archambault"), Jonathan Edwards ("Edwards"), Dana Yellow Fat ("Yellow Fat"), Valerie Dawn Wolfnecklace ("Wolfnecklace"), Clifton Verle Hollow ("Hollow"), Donald Dennis Strickland ("Strickland"), Aaron Gabriel Neyer ("Neyer"), and John and Jane Does described below whose identities are unknown to Dakota Access ("Doe Defendants") (collectively, "Defendants"), states and alleges as follows:

**PARTIES**

1. Dakota Access is a limited liability company organized and in good standing under the laws of the State of Delaware and authorized to do business in the State of North Dakota. No member of Dakota Access is a citizen of the States of North Dakota, South Dakota, Maryland, or Ohio.

2. Upon information and belief, Archambault is a citizen of the State of North Dakota.

3. Upon information and belief, Edwards is a citizen of the State of South Dakota.

4. Upon information and belief, Yellow Fat is a citizen of the State of North Dakota.

5. Wolfnecklace is a citizen of the State of North Dakota.

6. Hollow is a citizen of the State of North Dakota.

7. Strickland is a citizen of the State of Maryland.

8. Neyer is a citizen of the State of Ohio.

## JURISDICTION AND VENUE

9. The Court has jurisdiction over the subject matter of this controversy pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between Dakota Access and Defendants and the amount in controversy exceeds $75,000, exclusive of interest and costs.

10. This action is commenced by Dakota Access to obtain declaratory and injunctive relief barring Defendants from interfering with the rights of Dakota Access to construct the Dakota Access Pipeline ("the Pipeline") in North Dakota. Specifically, Defendants have interfered with construction of the Pipeline in Morton County, with the potential to continue into Emmons County, North Dakota, and other portions of the Pipeline.

11. Dakota Access has incurred substantial expense in permitting and commencing construction on the Pipeline. The estimated cost for construction of the Pipeline is $3.7 billion. In accordance with the permits and approvals obtained for the Project, Dakota Access has commenced construction activities for the Pipeline in North Dakota. Defendants, along with other protestors, have halted the construction activities of Dakota Access in the area of the Lake Oahe crossing in Morton County, with further obstructions anticipated along other portions of the Pipeline. As a result of Defendants' interference with construction of the Pipeline and damages stemming from the interference, the value of Dakota Access's interest in continuing construction exceeds the jurisdictional requirement of $75,000.

12. This action is appropriately venued in the District of North Dakota, Western Division, pursuant to 28 U.S.C. § 1391(b)(2) because the events giving rise to the claim occurred there.

## FACTUAL ALLEGATIONS

A. **The Pipeline.**

13. Dakota Access is constructing the Pipeline, an approximately 1,154-mile-long, 12-, 20-, 24-, and 30-inch-diameter crude oil pipeline and associated facilities. In North Dakota, the Pipeline will be located in Mountrail, Williams, McKenzie, Dunn, Mercer, Morton, and Emmons Counties. The Pipeline will provide capacity to transport as much as 570,000 barrels of oil a day from western North Dakota to existing pipeline infrastructure near Patoka, Illinois. From there, shippers will have access to markets and refineries on the East Coast and on the Gulf Coast.

14. The Pipeline is necessary to accommodate oil production from the Bakken and Three Forks formations, which has resulted in a five-fold increase in daily oil production in North Dakota in the last six years. Upon completion, the Pipeline will have capacity to transport nearly half of the oil produced in North Dakota each day.

15. Most of the oil produced in North Dakota is currently shipped by truck or rail because of the lack of pipeline capacity and the need for access to markets on the coasts. The Pipeline is a safer and more cost-effective way for North Dakota producers to reach markets on the East Coast and Gulf Coast. It will also ease overcrowding on railways, including railways in North Dakota caused by increased crude oil shipments, and will reduce the number of trucks on the road.

16. Dakota Access has obtained all necessary easements and rights of way to construct the Pipeline in North Dakota.

17. In order for the Pipeline to cross the Missouri River and Lake Oahe (the "Oahe Crossing"), Dakota Access has obtained all necessary federal, state, and local permits.

18. Dakota Access has obtained a Certificate of Corridor Compatibility and Route Permit from the North Dakota Public Service Commission.

19. Dakota Access has obtained a Sovereign Land Permit from the North Dakota State Water Commission.

20. On July 25, 2016, Dakota Access obtained authorization from the United States Army Corps of Engineers pursuant to Nationwide Permit No. 12.  This permit is only valid through March 18, 2017, therefore time is of the essence.

21. In order to obtain these permits and others, Dakota Access engaged in intensive coordination regarding the location of the Oahe Crossing, acquisition of easement agreements from private landowners on both sides of the Oahe Crossing, and had to prepare and submit detailed information regarding the Oahe Crossing to the applicable agencies.

**B.** **Defendants' Interference with Dakota Access's Lawful Construction of the Pipeline.**

22. Notwithstanding the exclusive rights granted to Dakota Access for construction of the Pipeline through appropriate easement agreements from landowners and necessary permits from the applicable local, state, and federal agencies, Defendants are seeking to prevent Dakota Access from constructing the Pipeline.

23. Defendants have prevented and are continuing to prevent Dakota Access from constructing the Pipeline's Oahe Crossing in Morton County, North Dakota, at a location approximately 34 miles south of Mandan, North Dakota, at Highway 1806 by blocking access to

and from the construction site there ("Construction Site") and by threatening Dakota Access's employees and/or contractors.

24. Dakota Access was scheduled to begin construction activities at the Oahe Crossing August 10, 2016.

25. On Wednesday August 10, 2016, representatives of Dakota Access arrived at the Construction Site and were met with resistance by approximately 15 to 30 individuals, including Edwards, who were protesting the construction of the Pipeline. By the afternoon, the number of individuals protesting at the Construction Site increased to approximately 100.

26. Edwards, along with Doe Defendants, began erecting obstructions near the Construction Site in effort to deter Dakota Access from accessing the Construction Site.

27. Edwards chained himself to a fence at the Construction Site to halt the construction activities of Dakota Access.

28. One Doe Defendant present had a large knife, approximately twelve inches in length strapped to the side of his hip. He made comments to Dakota Access representatives that they would not be able to enter or access the Construction site or bury the Pipeline there. He commented that if Dakota Access attempted such entry, individuals would get hurt.

29. Other Doe Defendants instructed Dakota Access's security personnel to leave.

30. Because of Edwards and Doe Defendants' actions, and out of concern that Edwards, protestors, or Dakota Access employees or contractors might be injured, Dakota Access's security personnel elected to deescalate the situation and notify law enforcement rather than proceed with construction activities.

31. On Thursday, August 11, 2016, representatives of Dakota Access again met with resistance at the Construction Site. By the afternoon, approximately 200 individuals, including

Strickland, Neyer, Wolfnecklace, and Hollow, were protesting the construction of the Pipeline at the Construction Site.

32. At least forty-five law enforcement officers were present at the Construction Site to monitor the protest, maintain the peace, and facilitate the lawful construction activities of Dakota Access.

33. Law enforcement set up a barricaded safe zone using a temporary fence and required the protestors to remain behind the fence so that they would not trespass or interfere with Dakota Access's construction activities.

34. Upon information and belief, Strickland, Neyer, and/or Doe Defendants refused to cooperate with law enforcement, pushed law enforcement officers, and tore down the barricade fencing, causing an uncontained crowd of individuals to swarm the Construction Site, in an effort to deter Dakota Access from constructing the Pipeline.

35. Strickland and Neyer were arrested and charged with disorderly conduct.

36. Upon information and belief, Wolfnecklace and Hollow jumped the fence and rushed toward the Dakota Access equipment at the Construction Site.  Hollow held a knife in his hand.  Officers chased and apprehended them after some resistance.

37. Wolfnecklace and Hollow were arrested and charged with criminal trespass and fleeing a police officer.  Hollow was also charged with preventing an arrest.

38. Upon information and belief, during the protest, Doe Defendants tried to block Dakota Access employees and contractors from entering and exiting the Construction Site by stationing themselves at the access routes to the Construction Site and erecting obstructions at or near the Construction Site.

39. During the late afternoon, six Doe Defendants charged law enforcement officers who were holding the barricade line. These Doe Defendants were arrested.

40. Throughout the day, comments were heard from the crowd threatening to bring weapons and use force or violence against law enforcement officers and/or Dakota Access representatives. One Doe Defendant claimed that he considered the situation to be a declaration of an act of war and that "force would be met with force."

41. As a result of Strickland, Neyer, Wolfnecklace, Hollow, and Doe Defendants' actions, and out of concern for the safety of those present at the Construction Site, Dakota Access's security personnel elected to deescalate the situation and rather than proceed with surveying the Construction Site.

42. On Friday, August 12, 2016, representatives of Dakota Access were again met with resistance at the Construction Site. By the afternoon, approximately 350 individuals were protesting at the Construction Site, including Archambault, who is the Chairman of the Standing Rock Sioux Tribe, and Yellow Fat, who is a Council Member At Large of the Standing Rock Sioux Tribe.

43. Upon information and belief, Archambault excused all Tribe employees from work on August 12, 2016, to encourage them to protest at the Construction Site and prevent Dakota Access from constructing the Pipeline.

44. Upon information and belief, Archambault, Yellow Fat, and/or Doe Defendants tried to block Dakota Access employees and contractors from entering and exiting the Construction Site and pushed law enforcement officers who had formed a line to protect the Dakota Access representatives exiting the Construction Site.

45. Archambault, Yellow Fat, and Doe Defendants were arrested and charged with disorderly conduct.

46. Throughout the day, comments were again heard from the crowd threatening to bring weapons and use force or violence against law enforcement officers and/or Dakota Access representatives.

47. Dakota Access representatives also have received threats via email. On August 12, 2016, a Dakota Access representative received an email from an unknown individual with an email address attributed to David Bowen, using foul language and stating, "Hope you end up killingg [*sic*] yourself . . ." The email was anonymously signed "Concerned Citizen."

48. By the afternoon, the crowd greatly outnumbered law enforcement and there was potential for the crowd to continue expanding.

49. As a result of safety concerns and Archambault, Yellow Fat, and Doe Defendants' actions, Dakota Access deescalated the situation and ceased construction activities.

50. The Morton County Sheriff's office decided to evacuate the Dakota Access employees and contractors at the Construction Site.

51. As the Dakota Access employees and contractors began exiting, a crowd of Doe Defendants broke through the law enforcement barriers and began to push law enforcement backwards.

52. Doe Defendants threw bottles and rocks at the exiting vehicles.

53. Doe Defendants surrounded and blocked the last vehicle, which belonged to a Dakota Access contractor. The Doe Defendants had to be removed so that the vehicle could exit the Construction Site and turn onto Highway 1806. The vehicle was dented from kicking and/or items thrown at it, but the individuals inside were unharmed.

54. Doe Defendants then broke through onto the access road at the Construction Site, entered onto the private property of the Construction Site, and forced law enforcement to retreat.

55. Doe Defendants tore out stakes, broke posts, and ripped off gates on the private property at the Construction Site.

56. Law enforcement retreated from the area, leaving the Construction Site unsecured.

57. Upon information and belief, a total of eighteen individuals were arrested on August 11 and 12, 2016, for their illegal actions at the Construction Site and charged with disorderly conduct, criminal trespass, and other charges.

58. On Saturday August 13, 2016, protesting continued at the Construction Site and south of the Construction Site on Highway 1806, even though Dakota Access was not engaged in any construction activities.

59. At one point, a large group of individuals proceeded to block traffic by traveling north on foot on Highway 1806 for approximately two miles from the Cannon Ball Bridge to the Construction Site.

60. Hundreds or potentially thousands of individuals are expected to gather at the Construction Site on Monday, August 15, 2016.

C.  **Dakota Access's Continuing Harm as a Result of Defendants' Interference.**

61. Upon information and belief, Defendants and other protestors will continue to disrupt Dakota Access construction activities; threaten the safety of Dakota Access employees and contractors and others; and interfere with the Dakota Access's lawful exercise of its right under the easements and permits it has obtained to construct the Pipeline.

62. Defendants' actions have created and will continue to create a risk of bodily injury and harm to Dakota Access employees and contractors, as well as to law enforcement personnel and other individuals at the Construction Site.

63. Defendants' actions have prevented and will continue to prevent Dakota Access from operating its business and are causing Dakota Access to lose goodwill among its customers.

64. Defendants' actions have prevented and will continue to prevent Dakota Access from engaging in lawful construction of the Pipeline at the Construction Site. Damages stemming from one day of lost construction on the Pipeline exceed $75,000, and are anticipated to increase significantly every day that construction is halted. Damages include wages for employees/contractors who were not able to complete work, delays in the schedule for Pipeline construction, increased security, along with many other expenses incurred.

65. Every day that Dakota Access is prevented from constructing the Pipeline, Defendants are diminishing Dakota Access's opportunity to complete construction of the Pipeline's water crossing before its permits expire.

## COUNT I - DECLARATORY JUDGMENT

66. Based on the foregoing, a case and controversy exists between the parties that warrants declaratory relief.

67. Under North Dakota and federal law, Dakota Access is entitled to construct the Pipeline in accordance with the easements, permits, and other approvals obtained for the Pipeline.

68. Accordingly, Dakota Access is entitled to a judgment pursuant to 28 U.S.C. § 2201, declaring that it has the right to construct the Pipeline without interference from Defendants.

## COUNT II - INJUNCTIVE RELIEF

69. As set forth above, Dakota Access and its contractors have the right to construct the Pipeline in North Dakota in accordance with the permits and authorizations obtained. Defendants have interfered with this right by engaging in obstructive and dangerous behavior in an apparent attempt to deter Dakota Access and also by intentionally and directly interfering with Dakota Access's construction activities.

70. Preliminary and permanent injunctive relief is necessary to prevent Defendants from further interfering with Dakota Access's rights.

71. Accordingly, the Court should enter an injunction barring Defendants from interfering with Dakota Access's right to construct the Pipeline.

## COUNT III – CIVIL TRESPASS

72. As set forth above, Dakota Access has obtained the easements and rights of way necessary to construct the Oahe Crossing of the Pipeline.

73. On August 10 through August 12, 2016, Dakota Access, by and through its employees and contractors, lawfully possessed the private property at the Construction Site for the purpose of constructing the Pipeline.

74. As set forth above, Edwards, Wolfnecklace, Hollow, and Doe Defendants intentionally and without consent or other privilege, unlawfully entered the private property at the Construction Site possessed by Dakota Access.

75. As a result of such trespass, Dakota Access has been damaged in the form of interference with its property rights, destruction of property, and the delay of the construction of the Oahe Crossing and associated costs and expenses

.

## REQUEST FOR RELIEF

**WHEREFORE**, Dakota Access requests judgment as follows:

a. A judgment declaring Dakota Access is entitled to construct the Pipeline in accordance with all local, state, and federal approvals obtained for the Pipeline;

b. A judgment preliminarily and permanently enjoining Defendants from interfering with Dakota Access's right to construct the Pipeline;

c. A judgment awarding Dakota Access monetary damages;

d. A judgment awarding Dakota Access its costs and, to the extent available under the law, reasonable attorney fees; and

e. Such further relief as the Court deems proper.

DATED this 15th day of August, 2016.

FREDRIKSON & BYRON P.A.

By: /s/ Lawrence Bender
LAWRENCE BENDER, ND Bar #03908
*Attorney for Plaintiff Dakota Access, LLC*
1133 College Drive, Suite 1000
Bismarck, ND  58501
E-mail:  lbender@fredlaw.com
Telephone:  (701) 221-8700

59438728_1.docx