IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| Dakota Access, LLC,<br><br>        Plaintiff,<br><br>vs.<br><br>Dave Archambault II, Jonathan Edwards, Dana Yellow Fat, Valerie Dawn Wolfnecklace, Clifton Verle Hollow, Donald Dennis Strickland, Aaron Gabriel Neyer, and John and Jane Does,<br><br>        Defendants. | Case No. _____<br><br>**BRIEF IN SUPPORT OF PLAINTIFF DAKOTA ACCESS, LLC'S MOTION FOR A TEMPORARY RESTRAINING ORDER** |

Plaintiff Dakota Access, LLC ("Dakota Access") respectfully requests that the Court enter a temporary restraining order prohibiting Defendants Dave Archambault II ("Archambault"), Jonathan Edwards ("Edwards"), Dana Yellow Fat ("Yellow Fat"), Valerie Dawn Wolfnecklace ("Wolfnecklace"), Clifton Verle Hollow ("Hollow"), Donald Dennis Strickland ("Strickand"), Aaron Gabriel Neyer ("Neyer"), and unidentified individuals referred to as John and Jane Does ("Doe Defendants") (collectively, "Defendants") from interfering with its right to construct the Dakota Access Pipeline (the "Pipeline") in accordance with all local, state, and federal approvals it has obtained.

## INTRODUCTION

Dakota Access holds all easements, rights of way, and permits necessary to construct the Pipeline in North Dakota and, more specifically, for the Pipeline to cross the Missouri River and Lake Oahe (the "Oahe Crossing"). Despite Dakota Access's legal right to construct the Pipeline, Defendants have repeatedly and intentionally interfered with Dakota Access's construction activities at the construction site for the Oahe Crossing in Morton County, North Dakota (the

"Construction Site") by physically obstructing Dakota Access employees and contractors from accessing the Construction Site, resisting law enforcement's attempts to secure the Construction Site, and threatening Dakota Access representatives.

In order to protect its employees, contractors, and other representatives from injury and to protect its right to construct the Pipeline, Dakota Access seeks a temporary restraining order prohibiting Defendants from interfering with Dakota Access's lawful construction activities.

## FACTUAL BACKGROUND

### A. The Parties and the Dakota Access Pipeline.

Dakota Access is a limited liability company dedicated to constructing the Pipeline. Compl. ¶¶ 1, 13. The Pipeline is an approximately 1,154-mile-long, 12-, 20-, 24-, and 30-inch-diameter crude oil pipeline stretching from North Dakota to existing pipeline infrastructure near Patoka, Illinois. *Id.* ¶ 14. In North Dakota, the Pipeline will be located in Mountrail, Williams, McKenzie, Dunn, Mercer, Morton, and Emmons Counties. *Id.* The Pipeline will provide capacity to transport as much as 570,000 barrels of oil a day from western North Dakota to Illinois, where shippers will have access to markets and refineries on the East Coast and on the Gulf Coast. *Id.*

The Pipeline is necessary to accommodate rapidly expanding oil production from the Bakken and Three Forks formations, which has resulted in a five-fold increase in daily oil production in North Dakota in the last six years. *Id.* Upon completion, the Pipeline will have capacity to transport nearly half of the oil produced in North Dakota each day. *Id.* Currently, most of the oil produced in North Dakota is shipped by truck or rail because of the lack of pipeline capacity and the need for access to markets on the coasts. *Id.* ¶ 15. The Pipeline is a safer and more cost-effective way for North Dakota producers to reach markets on the East Coast and Gulf Coast. *Id.* It will also ease overcrowding on railways, including railways in North

2

Dakota caused by increased crude oil shipments, and will reduce the number of trucks on the road.  *Id.*

Dakota Access has obtained all necessary easements and rights of way to construct the Pipeline in North Dakota and all necessary federal, state, and local permits for the Oahe Crossing.  *Id.* ¶¶ 16-17.  Specifically, Dakota Access has obtained a Certificate of Corridor Compatibility and Route Permit from the North Dakota Public Service Commission; a Sovereign Land Permit from the North Dakota State Water Commission; and authorization from the United States Army Corps of Engineers pursuant to Nationwide Permit No. 12.  *Id.* ¶¶ 18-19.  The Army Corp of Engineers' authorization under Nationwide Permit No. 12 is only valid through March 18, 2017, so therefore time is of the essence.  *Id.* ¶ 20.  In order to obtain these permits and others, Dakota Access engaged in intensive coordination regarding the location of the crossing, and it had to prepare and submit detailed information regarding the Oahe Crossing to the applicable agencies.  *Id.* ¶ 21.  In accordance with the permits and approvals obtained for the Project, Dakota Access has commenced construction activities for the Pipeline in North Dakota.  *Id.* ¶ 11.  Dakota Access has incurred substantial expense in permitting and commencing construction on the Pipeline.  *Id.*  The estimated total cost for construction of the Pipeline is $3.7 billion.  *Id.*

Defendants are individuals who are protesting the construction of the Pipeline and who, through their unlawful conduct, have halted the construction activities of Dakota Access in the area of the Oahe Crossing in Morton County.  *Id.* ¶¶ 22-23.

**B.**     ***Defendants Have Repeatedly Interfered with Dakota Access's Legal Right to Construct the Pipeline and Threatened the Safety of Dakota Access Employees and Contractors.***

Beginning August 10, 2016, and continuing through the present, Defendants have engaged in increasingly obstructionist and dangerous behavior in an effort to deter Dakota

Access from commencing lawful construction activities at the Oahe Crossing and to prevent the Pipeline's construction.

On Wednesday August 10, 2016, representatives of Dakota Access arrived at the Construction Site to commence construction activities for the Oahe Crossing. *Id.* ¶ 25. They were initially met with resistance by approximately 15 to 30 individuals protesting the Pipeline, including Edwards. *Id.* By afternoon, however, the crowd had swelled to approximately 100. *Id.* Edwards and unidentified Doe Defendants began erecting obstructions near the Construction Site and Edwards chained himself to a fence at the Construction Site in an effort to halt the construction activities of Dakota Access. *Id.* ¶¶ 26-27; Declaration of Paul Olson ("Olson Decl.") ¶ 7. One Doe Defendant present had a large knife, approximately twelve inches in length strapped to the side of his hip. *Id.* ¶ 28; Olson Decl. ¶ 8. He threatened Dakota Access representatives, stating that they would not be able to enter or access the Construction Site or bury the Pipeline there and that, if they attempted to, they would be hurt. *Id.* Other Doe Defendants also threatened Dakota Access's security personnel, telling them to leave. *Id.* ¶ 29. As a result of the interference and out of concern for the safety of Edwards, other protestors, and Dakota Access employees and contractors, Dakota Access elected to deescalate the situation and notify law enforcement rather than proceed with construction activities. *Id.* ¶ 30; Olson Decl. ¶ 10.

The following day, Thursday, August 11, 2016, representatives of Dakota Access again met with resistance at the Construction Site. *Id.* ¶ 31; Olson Decl. ¶ 11. By afternoon, approximately 200 individuals were protesting at the Construction Site, including Strickland, Neyer, Wolfnecklace, and Hollow. *Id.* Approximately 45 law enforcement officers were present at the Construction Site to monitor the protest, maintain the peace, and facilitate the lawful

4

construction activities of Dakota Access. *Id.* ¶ 32; Olson Decl. ¶ 11. Law enforcement set up a barricaded safe zone using temporary fencing and required the protestors to remain behind the fence so that they would not trespass or interfere with Dakota Access's construction activities. *Id.* ¶ 33. Strickland, Neyer, and/or Doe Defendants refused to cooperate, pushed law enforcement officers, and tore down the barricade fencing, causing an uncontained crowd of individuals to swarm the Construction Site. *Id.* ¶ 34; Olson Decl. ¶ 11. Strickland and Neyer were arrested and charged with disorderly conduct. *Id.* ¶ 35; Olson Decl. ¶ 11.

During the protest, Wolfnecklace and Hollow also refused to cooperate with law enforcement; Olson Decl. ¶ 12. They jumped the fence and rushed toward a Dakota Access contractor's equipment at the Construction Site. *Id.* ¶ 36; Olson Decl. ¶ 12. Hollow held a knife in his hand. *Id.* When law enforcement officers chased Wolfnecklace and Hollow, they fled and resisted arrest. *Id.* ¶¶ 36-37; Olson Decl. ¶ 12. They were charged with criminal trespass and fleeing a police officer. *Id.* ¶ 37; Olson Decl. ¶ 12. Hollow was also charged with preventing an arrest. *Id.*

Doe Defendants tried to block Dakota Access employees and contractors from entering and exiting the Construction Site by stationing themselves at the access routes to the Construction Site and erecting obstructions at or near the Construction Site. *Id.* ¶ 38. During the late afternoon, six Doe Defendants charged law enforcement officers who were holding the barricade line. *Id.* ¶ 39; Olson Decl. ¶ 13. These Doe Defendants were arrested. *Id.*

As a result of Strickland, Neyer, Wolfnecklace, Hollow, and Doe Defendants' threatening actions, Dakota Access again elected to deescalate the situation rather than proceed with construction activities and risk the safety of protestors, law enforcement, and Dakota Access employees and contractors. *Id.* ¶ 41; Olson Decl. ¶ 14.

On Friday, August 12, 2016, representatives of Dakota Access were again met with resistance at the Construction Site. *Id.* ¶ 42; Olson Decl. ¶ 15. The protestors included Archambault, the Chairman of the Standing Rock Sioux Tribe, and Yellow Fat, a Council Member At Large of the Standing Rock Sioux Tribe. *Id.* Archambault had excused all employees of the Standing Rock Sioux Tribe from work that day to encourage them to join the protest at the Construction Site and prevent Dakota Access from constructing the Pipeline. *Id.* ¶ 43.

Archambault, Yellow Fat, and unidentified Doe Defendants tried to block Dakota Access employees and contractors from entering and exiting the Construction Site by pushing law enforcement officers who had formed a line to protect the Dakota Access representatives who were exiting the Construction Site. *Id.* ¶¶ 44-45. Archambault, Yellow Fat, and Doe Defendants were arrested and charged with disorderly conduct. *Id.* ¶ 45.

By the afternoon, the crowd had swelled to approximate 350 protestors and greatly outnumbered law enforcement. *Id.* ¶¶ 42, 48; Olson Decl. ¶ 16. Out of concern for the safety of those present at the Construction Site, including Dakota Access employees and contractors, and a result of safety concerns and Archambault, Yellow Fat, and Doe Defendants' actions, Dakota Access ceased construction activities. *Id.* ¶ 49; Olson Decl. ¶ 16. The Morton County Sheriff's evacuated the Dakota Access employees and contractors at the Construction Site. *Id.* ¶ 50; Olson Decl. ¶ 16. As they began exiting, a crowd of Doe Defendants broke through the law enforcement barriers and began to push law enforcement backwards. *Id.* ¶ 51; Olson Decl. ¶ 16. The Doe Defendants threw bottles and rocks at the exiting vehicles and surrounded and blocked the last vehicle, which belonged to a Dakota Access contractor. *Id.* ¶¶ 52-53; Olson Decl. ¶ 16. The Doe Defendants had to be removed so that the vehicle could exit the Construction Site and

6

turn onto N.D. Highway 1806. *Id.* ¶ 53; Olson Decl. ¶ 16. The vehicle was dented from kicking and/or items thrown at it, but the individuals inside were unharmed. *Id.*

After Dakota Access had vacated the Construction Site, Doe Defendants broke through onto the access road at the Site, entered onto the private property of the Construction Site, and tore out stakes, broke posts, and ripped off gates on the private property at the Construction Site. *Id.* ¶¶ 54-55; Olson Decl. ¶ 17. Law enforcement was forced to retreat from the area, leaving the Construction Site unsecured. *Id.* ¶ 56; Olson Decl. ¶ 17.

A total of eighteen individuals were arrested on August 11 and 12, 2016, for their illegal actions at the Construction Site and charged with disorderly conduct and criminal trespass, among other charges. *Id.* ¶ 57.

Throughout August 11 and 12, 2016, Doe Defendants in the crowd threatened to use force or violence against law enforcement officers and/or Dakota Access representatives. *Id.* ¶¶ 40, 46. For example, one Doe Defendant claimed that he considered the situation to be a declaration of an act of war and stated that "force would be met with force." *Id.* ¶ 40; Olson Decl. ¶ 18. At least two of the Defendants were armed with knives—a Doe Defendant on August 10, 2016, and Hollow on August 12, 2016; Olson Decl. ¶¶ 12, 18. During the protests, other Doe Defendants in the crowd threatened to bring weapons. *Id.* ¶¶ 40, 46; Olson Decl. ¶ 18. Dakota Access representatives also received violent and threatening messages from individuals protesting the Pipeline. *Id.* ¶ 47; Olson Decl. ¶ 19. For example, on Friday, August 12, 2016, a Dakota Access representative received a message from an unknown individual that used foul language and read, "Hope you end up killingg [*sic*] yourself . . . ." *Id.* The email was anonymously signed "Concerned Citizen." *Id.*

Although Dakota Access representatives did not engage in any construction activities on Saturday, August 13, 2016, the protests continued at the Construction Site, spreading to nearby roadways.  *Id.* ¶¶ 58-59; Olson Decl. ¶ 20.  At one point on Saturday, a large group of individuals blocked traffic by traveling on foot on N.D. Highway 1806 for two miles, heading north from the Cannon Ball Bridge to the Construction Site.  *Id.*

Dakota Access expects that hundreds, if not thousands, of individuals will be protesting at the Construction Site on Monday, August 15, 2016, when Dakota Access representatives return to commence construction activities, and that Defendants will continue to interfere with Dakota Access's right to construct the Pipeline by physically obstructing and threatening Dakota Access employees and contractors and the law enforcement personnel working to keep them safe.  *Id.* ¶ 60; Olson Decl. ¶ 21.

### D. *Defendants' Interference and Threats Have Caused and Will Continue to Cause Harm to Dakota Access.*

By their conduct, Defendants have prevented and will continue to prevent Dakota Access from engaging in lawful construction of the Pipeline at the Construction Site in accordance with the property rights and permits that it has acquired under federal, state, and local law.  *Id.* ¶ 45. Damages stemming from one day of lost construction on the Pipeline exceed $75,000, and are anticipated to increase significantly every day that construction is halted.  *Id.*  Damages include wages for employees/contractors who were not able to complete work, delays in the schedule for Pipeline construction, increased security, along with many other expenses incurred.  *Id.*  By preventing Dakota Access from operating its business, Defendants have caused and will continue to cause Dakota Access to lose goodwill among its customers.  *Id.* ¶ 44.

More importantly, Defendants' conduct has placed and will continue to place Dakota Access employees and contractors at a substantial risk of injury.  By making verbal and physical

threats, carrying weapons, physically blocking access to the Construction Site, refusing to cooperate with law enforcement, trespassing on and destroying private property, and using physical force to resist law enforcement, Defendants are putting Dakota Access employees and contractors at risk of bodily harm.

## ARGUMENT

I. **THIS COURT HAS JURISDICTION OVER THE PROCEEDING.**

Jurisdiction under 28 U.S.C. § 1332 requires complete diversity of citizenship and a minimum amount in controversy in excess of $75,000. *Saunders v. Countrywide Home Loans of Minn., Inc.*, 548 F. Supp. 2d 692, 693 (D. Minn. 2008). "Complete diversity of citizenship exists where no defendant holds citizenship in the same state where any plaintiff holds citizenship." *Id.* (quoting *OnePoint Solutions, LLC v. Borchert*, 486 F.3d 342, 346 (8th Cir. 2007)). In this instance, jurisdiction is proper because Defendants are citizens of the States of North Dakota, South Dakota, Maryland, and Ohio and Dakota Access is not. *See* Compl. ¶¶ 1–8; *see also* 28 U.S.C. 1441(b) (providing that the citizenship of unidentified defendants does not destroy diversity jurisdiction). Moreover, the amount in controversy exceeds $75,000.00, exclusive of interest and costs. *See* Compl. ¶¶ 7, 45; *see also Bergstrom v. Burlington N. R. Co.*, 895 F.Supp. 257, 262 (D. N.D. 1995*)* (holding that the value of equitable relief counts toward amount-in-controversy requirement). Therefore, this Court has jurisdiction under 28 U.S.C. § 1332(a).

II. **A TEMPORARY RESTRAINING ORDER IS NECESSARY TO PREVENT IRREPARABLE HARM.**

The Court should issue a temporary restraining order preventing Defendants from further interfering with Dakota Access's lawful construction of the Pipeline. Without such an order from this Court, Defendants, through their physical interference and intimidation, will prevent

Dakota Access from exercising the rights granted to it by the easements, rights of way, and permits it has obtained under federal, state, and local law.

A temporary restraining order is appropriate and necessary to prevent immediate and irreparable injury, loss, or damage to Dakota Access. Rule 65(b) of the Federal Rules of Civil Procedure governs the issuance of temporary restraining orders. Pursuant to Rule 65(b), the Court must look to the specific facts to determine whether immediate and irreparable injury, loss, or damage will result to the applicant. In determining whether to issue injunctive relief, the Court is required to consider:

(1) The probability that the movant will succeed on the merits;

(2) The threat of irreparable harm to the moving party;

(3) The balance between the harm to the movant if the injunction is granted; and

(4) The public interest.

*Dataphase Systems, Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981).[1] The inquiry for the Court is not a rigid test. Instead, "[a]t base, the question is whether the balance of the equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Id.* "No single factor in itself is dispositive; in each case all of the factors must be considered to determine whether on balance they weigh towards granting the injunction." *See CDI Energy Servs., Inc. v. W. River Pumps, Inc.*, No. 1:07-CV-085, 2007 WL 4180581, at *3 (D.N.D. Nov. 20, 2007) (quoting *Baker v. Electric Co-op, Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir. 1994)) (granting ex parte temporary restraining order).

---

[1] It is well-established that applications for preliminary injunctions and temporary restraining orders are generally measured against the same factors. *See Wachovia Secs., L.L.C. v. Stanton*, 571 F. Supp. 2d 1014, 1031 (N.D. Iowa 2008).

### A. *Dakota Access Is Likely To Prevail On The Merits.*

When evaluating a movant's "likelihood of success on the merits" the Court should "flexibly weigh the case's particular circumstances to determine 'whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined.'" *Calvin Klein Cosmetics Corp. v. Lenox Lab, Inc.*, 815 F.2d 500, 503 (8th Cir. 1987) (quoting *Dataphase Sys., Inc.*, 640 F.2d at 113). Although a temporary restraining order cannot be issued if the movant has no chance on the merits, "the Eighth Circuit has rejected a requirement that a 'party seeking preliminary relief prove a greater than fifty per cent likelihood that he will prevail on the merits.'" *PCTV Gold, Inc. v. SpeedNet, LLC*, 508 F.3d 1137, 1143 (8th Cir. 2007) (quoting *Dataphase Sys., Inc.*, 640 F.2d at 113).

In this action, Dakota Access seeks to ensure the safety of its employees and contractors and the operation of its business by restraining Defendants from continuing to interfere with its contractual and property rights and by collecting compensation for the damage Defendants have already caused. Dakota Access asserts three counts against Defendants: Declaratory Relief; Injunctive Relief; and Trespass. Dakota Access is likely to prevail on all three counts.

The Declaratory Judgment Act authorizes a Court to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. Dakota Access is likely to prevail on the merits of its claims for declaratory judgment and injunctive relief because it can demonstrate that its construction activities in North Dakota are lawful and that Defendants are interfering with its right to engage in such construction.

Dakota Access holds the necessary easements, rights of way, and permits required to construct the Oahe Crossing of the Pipeline. Specifically, Dakota Access has obtained a

11

Certificate of Corridor Compatibility and Route Permit from the North Dakota Public Service Commission; a Sovereign Land Permit from the North Dakota State Water Commission; and authorization from the United States Army Corps of Engineers pursuant to Nationwide Permit No. 12.  Compl. ¶¶ 18-19.  Defendants are interfering with Dakota Access's ability to exercises its right to construct the Pipeline.  By obstructing access to the Construction Site and by using physical force and verbal threats to deter Dakota Access from constructing the Pipeline, Defendants have prevented and will continue to prevent Dakota Access from engaging in lawful construction activities.  Defendants have no legal claim to the Construction Site and no other legal basis for interfering with Dakota Access's construction of the Pipeline and the Oahe Crossing.  These facts alone are sufficient to demonstrate that Dakota Access is likely to prevail on its claims.

In fact, this Court found a strong likelihood of success under similar circumstances in *Continental Resources, Inc. v. Langved*, No. 4:15-cv-19, 2015 WL 686965, at *4-5 (D.N.D. Feb. 18, 2015).  There, the plaintiff moved for a temporary restraining order to prevent the defendant from continuing to interfere with its contractual right to develop the oil and gas underneath the relevant property.  *Id.*  The Court held that the plaintiff had shown a strong likelihood of success on its claims for declaratory and injunctive relief because, like here, it appeared that the plaintiff had the clear legal right to develop the oil and gas and the defendant had no legal basis to interfere with the plaintiff's exercise of that right.  *Id.*

Dakota Access is also likely to prevail on its trespass claim.  Under North Dakota law, trespass is "an intentional harm, where a person intentionally and without a consensual or other privilege enters land in possession of another or any part thereof or causes a thing or third person so to do." *Tibert v. Slominski*, 692 N.W.2d 133, 137 (N.D. 2005) (quotations omitted).  Here,

Dakota Access has alleged and will be able to prove that it lawfully possessed the private property at the Construction Site pursuant to its easements and other agreements with the landowners. Dakota Access will also be able to prove that certain Defendants intentionally entered the private property that it was in possession of, without consent or privilege. Edwards trespassed on August 10, 2016, when he chained himself to the fence at the Construction Site. Wolfnecklace and Hollow trespassed at the Construction Site on August 11, 2016, as reflected by the charges against them. And unidentified Doe Defendants trespassed at the Construction Site on August 12, 2016, when they entered the property and damaged or destroyed fences, gates, and stakes thereon.

Thus, because Dakota Access will be able to prove that Defendants have interfered with its right to construct the Oahe Crossing without legal justification and have trespassed on property that it lawfully possessed, Dakota Access is almost certain to prevail on its claims.

### B. *Defendants Have Caused and Will Continue to Cause Irreparable Harm Absent A Temporary Restraining Order.*

Dakota Access is entitled to a temporary restraining order if it can establish that there is a threat of irreparable harm. Irreparable harm is an injury that cannot be fully compensated by money damages from the defendants if injunctive relief is denied and the plaintiff later prevails. *Doe v. LaDue*, 514 F. Supp. 2d 1131, 1135 (D. Minn. 2007).

Here, Dakota Access has established a threat of irreparable harm because Defendants' conduct has caused and will continue to cause a substantial threat of physical harm to Dakota Access employees and contractors. As this Court has previously recognized, physical harm is unlawful and "clearly irreparable." *Continental*, 2015 WL 686965, at *5. Thus, where a defendant's conduct presents a threat of physical harm to the plaintiff, a temporary restraining order is appropriate. *See, e.g.*, *id.*; *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1068 (6th Cir.

1998) ("We have no doubt that the [plaintiffs] would suffer irreparable harm should the threat to their personal security ever materialize."); *see also* N.D.C.C. § 34-08-07 (permitting courts to restrain threatened or continued unlawful acts).

Here, Dakota Access has demonstrated that its employees and contractors face a substantial threat of physical harm as a result of Defendants' conduct. During just three days of protests, eighteen Defendants were arrested for unlawful behavior at the Construction Site, including disorderly conduct and trespass. Defendants escalated their demonstration at the Construction Site from a peaceful protest to a threat to public safety and the safety of Dakota Access employees and contractors by, among other conduct:

- Carrying weapons to the Construction Site;
- Threatening to bring additional weapons to the Construction Site;
- Physically obstructing Dakota Access's employees and contractors from accessing the Construction Site;
- Disregarding instructions from law enforcement;
- Tearing down barriers erected by law enforcement;
- Pushing or charging law enforcement who were trying to protect Dakota Access employees and contractors;
- Fleeing law enforcement and resisting arrest;
- Trespassing on private property and damaging or destroying it by tearing gates, fences, and stakes;
- Trespassing on private property and rushing toward Dakota Access contractors' equipment;
- Throwing rocks and bottles at Dakota Access employees and contractors while they are exiting the Construction Site in their vehicles; and
- Making verbal and written threats of force and violence to Dakota Access employees and contractors and/or law enforcement;

Defendants' conduct has already presented a threat of injury to Dakota Access contractors and employees so serious that, on Friday, August 12, 2016, the Morton County, North Dakota Sheriff's Office decided to evacuate all Dakota Access employees and contractors from the Construction Site. Defendants are not entitled to put Dakota Access's employees and contractors at risk for simply doing their job. The Court should issue a temporary restraining order to ensure

14

that Defendants' dangerous conduct does not continue and does not cause grave and irreparable harm to the individuals employed by Dakota Access.

In addition, absent a temporary restraining order, Dakota Access will suffer irreparable harm in the form of lost business and goodwill. The Eighth Circuit has held that a threatened loss of goodwill is sufficient to constitute irreparable harm. *Medicine Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801, 805 (8th Cir. 2003). Federal courts have also concluded that the loss of ongoing business "cannot be fully compensated by subsequent monetary damages" and "is not measurable entirely in monetary terms." *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir. 1970); *see Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 37 (2d Cir. 1995); *Ryko Mfg. Co. v. Eden Servs.*, 759 F.2d 671, 673 (8th Cir. 1985) (affirming district court's finding that irreparable harm was shown and injunction was warranted when distributor would be possibly forced out of business); *see also* N.D.C.C. § 38-08-01 (providing that it is the policy of the State of North Dakota to "to foster, to encourage, and to promote the development, production, and utilization of natural resources of oil and gas"). Here, Defendants are preventing Dakota Access from exercising the rights expressly granted to it pursuant to the applicable easement agreements, rights of way, and permits that it has obtained, even though Defendants have no legal basis for doing so. If Defendants are allowed to prevent Dakota Access from constructing the Pipeline, even temporarily, Defendants will wrongfully strip Dakota Access of its contractual rights and halt its business operations. The potential harm posed by such damage to Dakota Access's business and goodwill cannot be compensated solely with money damages.

15

Because Dakota Access has established a substantial threat of physical injury to its employees and contractors, as well as irreparable harm to its business and goodwill, as a result of Defendants' conduct, this factor weighs in favor of the issuance of a temporary restraining order.

### C.     *The Balance of Harms Favors Dakota Access.*

The balance of harms also favors Dakota Access.  If the motion is denied, Dakota Access will be forced to either give up its planned construction activities or continue them in the face of substantial risk of physical harm to its contractors and employees, as well as to law enforcement and protestors. Under either scenario, Dakota Access will be irreparably harmed.

On the other hand, the temporary restraining order that Dakota Access seeks will not harm Defendants in any way.  Defendants will be permitted to exercise their right to peacefully protest the construction of the Pipeline without interfering with Dakota Access's construction activities. Dakota Access is not requesting that this Court curtail Defendants' First Amendment rights in any capacity, even though minor infringement would be justified in light of Defendants' conduct.  *See United States v. Lindgren*, 883 F. Supp. 1321, 1333 (D.N.D. 1995) (issuing preliminary injunction requiring protestor to maintain 100 foot distance from clinic entrance, employees, and employees' homes and holding that the injunction was "necessary and prudent in light of the grave concerns raised by [the defendant's] statements and conduct" even though it "will infringe somewhat upon [the defendant's] ability to speak on the issue . . . in the manner he would like").  Rather, the temporary restraining order will only prevent Defendants from continuing to cross the line from peaceable demonstration to undue interference and intimidation.

Therefore, the balance of harms weighs in favor of Dakota Access and this factor weighs in favor of the Court issuing a temporary restraining order.

### D. The Public Interest Favors Dakota Access.

The final *Dataphase* factor, which involves consideration of public policy expressed in the statutes, also favors the issuance of a temporary restraining order. The North Dakota legislature has specifically declared that the development and utilization of oil and gas is in the public interest. N.D.C.C. § 38-08-01 (it is "in the public interest to foster, to encourage, and to promote the development, production, and utilization of natural resources of oil and gas in the state . . . ."). The Pipeline that Dakota Access is constructing will further this public policy objective by facilitating the sale of North Dakota's oil across the country, thereby promoting the development and production of North Dakota's natural resources, in addition to their utilization.

Additionally, it is certainly in the public interest to protect companies and their employees from physical harm while engaged in lawful business activities and to prevent unlawful conduct.

Therefore, public policy favors issuance of a temporary restraining order because it fulfills the public policy of promoting and facilitating the development of North Dakota's natural resources and protecting individuals from physical violence.

## III. NO SECURITY SHOULD BE REQUIRED.

Rule 65(c) of the Federal Rules of Civil Procedure provides that the party seeking a temporary restraining order must post a security bond in an amount the Court deems proper. No bond should be required in this matter. As discussed above, no legally cognizable harm will accrue to Defendants if they are enjoined from interfering with Dakota Access's exercise of its legal rights to construct the Pipeline. Thus, Dakota Access should not be required to post any security bond in this action.

## IV. THE COURT SHOULD ISSUE THE TEMPORARY RESTRAINING ORDER EX PARTE.

Dakota Access will provide notice to Archambault, Edwards, Yellow Fat, Wolfnecklace, Hollow, Strickland, and Neyer that this motion has been filed. Dakota Access has engaged a process server who will attempt to serve these Defendants with the Summons, Verified Complaint, Motion for Temporary Restraining Order, Brief in Support of Motion for Temporary Restraining Order, and all other supporting papers. Decl. of Lawrence Bender ("Bender Decl.") ¶ 2. In addition, Dakota Access will continue working with law enforcement and its security personnel to identify the Doe Defendants and will attempt to personally serve each additional Defendant identified with the Summons, Verified Complaint, Motion for Temporary Restraining Order, Brief in Support of Motion for Temporary Restraining Order, and all other supporting papers, as well. *Id.* ¶ 4.

In light of the immediacy and the gravity of Defendants' escalating conduct and the corresponding risk to Dakota Access and its employees and contractors, the Court should issue the order *ex parte*, pending completion of service by Dakota Access. The Court has authority to issue an *ex parte* restraining order under Federal Rule of Civil Procedure 65(b), even though the identities of all Defendants are not yet known. *See, e.g.*, *Am. Can Co. v. Mansukhani*, 742 F.2d 314, 321 (7th Cir. 1984) (noting that a temporary restraining order may be granted ex parte when "the identity of the adverse party is unknown or . . . a known party cannot be located in time for a hearing"); *see also, e.g.*, *Delta Air Lines, Inc. v. Does*, No. 615CV2079ORL31TBS, 2015 WL 8660986, at *6 (M.D. Fla. Dec. 14, 2015) (granting temporary restraining order against unnamed defendants); *Jam Prods., Ltd. v. Doe(s)*, No. 85 C 03640, 1985 WL 574, at *1 (N.D. Ill. Apr. 15, 1985) (same); *Moon Records v. Various John Does*, No. 81-c-90719, 81 WL 47050, (N.D. Ill. Fe. 26, 1981) (same).

If granted, Dakota Access will distribute copies of the temporary restraining order to protestors present at the Construction Site so that they are on notice of the Court's Order. Bender Decl. ¶ 6; *see Cmty. College District No. 6 v. Krasnowski*, 5 Wash. App. 232 (Wash. Ct. App. 1971) (granting a temporary restraining order against named parties as well as unnamed parties in active concert with the named parties and holding that those affected received notice of temporary restraining order when copies of the order were distributed at a protest and the order was read to the protestors with an amplifying device).

## CONCLUSION

The balance of equities so favors Dakota Access that justice requires the Court to intervene. Therefore, the Court should grant Dakota Access's motion for a temporary restraining order and enjoin Defendants from interfering with Dakota Access's construction of the Pipeline.

Dated this 15th day of August, 2016.

                FREDRIKSON & BYRON P.A.

                By: /s/ Lawrence Bender
                LAWRENCE BENDER, ND Bar #03908
                *Attorneys for Plaintiff Dakota Access, LLC*
                1133 College Drive, Suite 1000
                Bismarck, ND  58501
                E-mail:  lbender@fredlaw.com
                Telephone:  (701) 221-8700

59438736_1.docx