IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| Dakota Access, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | )  **ORDER GRANTING PLAINTIFF'S** |
| vs. | )  **MOTION FOR TEMPORARY** |
| | )  **RESTRAINING ORDER** |
| Dave Archambault, II, Jonathan Edwards, | ) |
| Dana Yellow Fat, Valerie Dawn | )  Case No.: 1:16-cv-296 |
| Wolfnecklace, Clifton Verle Hollow, | ) |
| Donald Dennis Strickland, Aaron | ) |
| Gabriel Neyer, and John & Jane Does, | ) |
| | ) |
| Defendants. | ) |

Before the Court is the Plaintiff's "Motion for a Temporary Restraining Order" filed on August 15, 2016. See Docket No. 3. The Plaintiff seeks a temporary restraining order pursuant to Rule 65(b) of the Federal Rules of Civil Procedure, specifically requesting an order prohibiting the Defendants from interfering with Plaintiff's construction of the Dakota Access Pipeline. For the reasons set forth below, the Court grants the Plaintiff's motion.

I.   **BACKGROUND**

The Plaintiff, Dakota Access, LLC ("Dakota Access"), is a Delaware limited liability company that is authorized to do business in North Dakota. See Docket No. 1. No member of Dakota Access is a citizen of North Dakota, South Dakota, Maryland, or Ohio. Dakota Access is engaged in the business of constructing the Dakota Access Pipeline (the "Pipeline") in North Dakota and specifically, for the Pipeline to cross the Missouri River and Lake Oahe (the "Oahe Crossing"). The Pipeline is an approximately 1,154-mile-long crude oil pipeline stretching from North Dakota to existing pipeline infrastructure near Patoka, Illinois. The named Defendants are

1

citizens of North Dakota, South Dakota, Maryland, and Ohio who are protesting the Pipeline's construction. See Docket No. 1, pp. 1-2.

Dakota Access has obtained the necessary easements and rights of way to construct the Pipeline in North Dakota and the necessary federal, state, and local permits for the Oahe Crossing. See Docket No. 1, p. 4. In accordance with the permits and approvals obtained for the Pipeline project, Dakota Access has commenced construction activities in North Dakota. The estimated total cost for the Pipeline's construction is $3.7 billion.

On August 10, 2016, Dakota Access representatives arrived at the construction site in Morton County, North Dakota, to commence construction for the Oahe Crossing. Approximately 15 to 30 individuals were present to protest the Pipeline's construction, including Defendant Jonathan Edwards. By the afternoon, approximately 100 individuals had gathered to protest. Defendant Edwards and other unidentified Doe Defendants began erecting obstructions near the construction site, and Defendant Edwards chained himself to a fence in an effort to halt the construction activities. See Docket No. 6. One John Doe Defendant present at the site who had a large knife strapped to his hip threatened Dakota Access representatives, stating they would not be able to enter or access the construction site or bury the Pipeline there and that, if they attempted to do so, they would be hurt. Other Doe Defendants also threatened Dakota Access's security personnel, telling them to leave. As a result of the Defendants' interference and safety concerns, Dakota Access elected to halt construction activities and notify law enforcement.

The following day, August 11, 2016, protestors were again present at the construction site. See Docket No. 6. By the afternoon, approximately 200 protestors were present, including Defendants Donald Strickland, Aaron Neyer, Valerie Wolfnecklace, and Clifton Hollow.

Approximately 45 law enforcement officers were also present to monitor the protest, maintain the peace, and facilitate Dakota Access' construction activities. Law enforcement officers set up a barricade using temporary fencing and required protestors to remain behind the fence so they would not trespass or interfere with Dakota Access' activities. Defendants Strickland, Neyer, and/or Doe Defendants refused to cooperate, pushed law enforcement officers, and tore down the barricade fencing. Defendants Strickland and Neyer were arrested and charged with disorderly conduct. Defendants Wolfnecklace and Hollow, who held a knife in his hand, also refused to cooperate with law enforcement, jumped the fence, and ran toward a Dakota Access contractor's equipment. Defendants Wolfnecklace and Hollow were charged with criminal trespass and fleeing a police officer, and Defendant Hollow was also charged with preventing an arrest. Doe Defendants attempted to block Dakota Access employees and contractors from entering and exiting the construction site by positioning themselves at the access routes and erecting obstructions at or near the construction site. Six Doe Defendants charged law enforcement officers who were holding the barricade line, and those Doe Defendants were later arrested. As a result of Defendants' actions and safety concerns, Dakota Access again elected to halt construction activities.

On August 12, 2016, approximately 350 protestors were present at the construction site, including Defendants Dave Archambault II, Chairman of the Standing Rock Sioux Tribe, and Dana Yellow Fat, Council Member At Large of the Standing Rock Sioux Tribe. See Docket No. 6. Defendant Archambault had excused all Standing Rock Sioux Tribe employees from work that day to encourage them to join the protest and prevent Dakota Access from constructing the Pipeline. Defendants Archambault, Yellow Fat, and unidentified Doe Defendants tried to block Dakota Access employees and contractors from entering and exiting the construction site by

pushing law enforcement officers who had formed a line to allow Dakota Access representatives to exit the site. Defendants Archambault, Yellow Fat, and Doe Defendants were arrested and charged with disorderly conduct. By the afternoon, approximately 350 protestors were present. Due to Defendants' actions and safety concerns, Dakota Access ceased construction activities. The Morton County Sheriff's Office began to evacuate Dakota Access employees and contractors from the site. As they began exiting, Doe Defendants broke through the law enforcement barriers and began to push law enforcement backwards. The Doe Defendants threw bottles and rocks at the exiting vehicles and surrounded and blocked the last vehicle, which belonged to a Dakota Access contractor. The Doe Defendants had to be removed so the vehicle could exit the site. Although the individuals inside the vehicle were unharmed, the vehicle was dented from being kicked and having items thrown at it. After Dakota Access employees and contractors left the site, Doe Defendants broke through onto the access road, entered the construction site's private property, and tore out stakes, broke posts, and ripped off gates. Eighteen individuals were arrested on August 11 and 12, 2016, for their actions at the construction site.

Doe Defendants threatened to use force or violence against law enforcement officers and/or Dakota Access representatives throughout August 11 and 12, 2016. One Doe Defendant claimed he considered the situation to be a declaration of an act of war and stated "force would be met with force." See Docket No. 6. At least two of the Defendants were armed with knives—a Doe Defendant on August 10, 2016, and Defendant Hollow on August 12, 2016. During the protests, other Doe Defendants threatened to bring weapons. Dakota Access representatives also received violent and threatening messages from individuals protesting the Pipeline. On August 12, 2016, a Dakota Access representative received a message from an unknown individual that read, "Hope you end up killingg [sic] yourself . . . ." The email was anonymously signed "Concerned Citizen."

Dakota Access representatives did not engage in any construction activities on August 13, 2016; however, protests continued at the construction site and spread to nearby roadways. See Docket No. 6. At one point, a group of individuals blocked traffic by traveling on foot on N.D. Highway 1806 for two miles, heading north from the Cannon Ball Bridge to the construction site.

Dakota Access expects that a large number of individuals will be protesting at the construction site on August 15, 2016, when Dakota Access representatives return to commence construction activities. See Docket No. 6. Dakota Access also expects that Defendants will continue to interfere with its right to construct the Pipeline by physically obstructing and threatening Dakota Access employees and contractors and law enforcement officers.

On August 15, 2016, Dakota Access filed a complaint, asserting claims of declaratory judgment, injunctive relief, and civil trespass, and a motion for a temporary restraining order. See Docket Nos. 1 and 3. Dakota Access seeks to restrain and enjoin the Defendants from obstructing or interfering in any way with its construction of the Pipeline. Dakota Access notes it will provide notice of the motion to the named Defendants by engaging a process server who will attempt to serve the named Defendants with the pertinent documents. See Docket No. 4, p. 18. In addition, Dakota Access notes it will continue to work with law enforcement to identify the Doe Defendants and will attempt to personally serve the previously filed documents to each additional Defendant identified. See Docket No. 4, p. 18. Further, Dakota Access asserts that if its motion is granted, it will distribute copies of the temporary restraining order to protestors present at the Pipeline's construction site so they are on notice of the Court's order. See Docket No. 4, p. 19.

## II.  STANDARD OF REVIEW

Dakota Access seeks a temporary restraining order pursuant to Rule 65(b) of the Federal Rules of Civil Procedure, which provides in relevant part as follows:

**(b) Temporary Restraining Order.**

**(1)** *Issuing Without Notice.* The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if:

**(A)** specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and

**(B)** the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

The United States Supreme Court has recognized that in some limited situations, a court may properly issue *ex parte* orders of brief duration and limited scope to preserve the status quo pending a hearing.  Granny Goose Foods, Inc. v. Teamsters, 415 U.S. 423, 438-39 (1974); Carroll v. Princess Anne, 393 U.S. 175, 180 (1968).  The limited nature of *ex parte* remedies:

> reflect[s] the fact that our entire jurisprudence runs counter to the notion of court action taken before reasonable notice and an opportunity to be heard has been granted both sides of a dispute. *Ex parte* temporary restraining orders are no doubt necessary in certain circumstances, cf. Carroll v. President and Comm'rs of Princess Anne, 393 U.S. 175, 180 . . . (1968), but under federal law they should be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer.

Granny Goose Foods, 415 U.S. at 438-39 (emphasis in original).

Rule 65(b) directs the court to look to the specific facts shown by an affidavit to determine whether immediate and irreparable injury, loss, or damage will result to the applicant.  In addition, it is well-established the court is required to consider the factors set forth in Dataphase Systems, Inc., v. C L Systems, Inc., 640 F.2d 109, 114 (8th Cir. 1981), in determining whether a temporary

6

restraining order should be granted. The *Dataphase* factors include "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." Id.

### III. LEGAL DISCUSSION

It is well-established that the movant has the burden of establishing the necessity of a temporary restraining order. Baker Elec. Coop., Inc. v. Chaske, 28 F.3d 1466, 1472 (8th Cir. 1994). "No single factor in itself is dispositive; in each case all of the factors must be considered to determine whether on balance they weigh towards granting the injunction." Id. at 1472.

#### A. PROBABILITY OF SUCCESS ON THE MERITS

When evaluating a movant's likelihood of success on the merits, the court should "flexibly weigh the case's particular circumstances to determine 'whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined.'" Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc., 815 F.2d 500, 503 (8th Cir. 1987). At this preliminary stage, the Court need not decide whether the party seeking the temporary restraining order will ultimately prevail. PCTV Gold, Inc. v. SpeedNet, LLC, 508 F.3d 1137, 1143 (8th Cir. 2007). Although a temporary restraining order cannot be issued if the movant has no chance on the merits, "the Eighth Circuit has rejected a requirement as to a 'party seeking preliminary relief prove a greater than fifty per cent likelihood that he will prevail on the merits.'" Id. The Eighth Circuit has also held that of the four factors to be considered by the district court

in considering preliminary injunctive relief, the likelihood of success on the merits is "most significant." S & M Constructors, Inc. v. Foley Co., 959 F.2d 97, 98 (8th Cir. 1992).

The Court must consider the substantive claims in determining whether Dakota Access has a likelihood of success on the merits. Dakota Access is asserting claims of declaratory judgment, injunctive relief, and civil trespass. See Docket No. 1. A likelihood of success on the merits of even one claim can be sufficient to satisfy the "likelihood of success" *Dataphase* factor. See Nokota Horse Conservancy, Inc. v. Bernhardt, 666 F. Supp. 2d 1073, 1078-80 (D.N.D. 2009).

Dakota Access seeks to ensure the safety of its employees and contractors and the operation of its business by restraining Defendants from continuing to interfere with its contractual and property rights and by collecting compensation for the damage Defendants have already caused. Dakota Access asserts it is likely to prevail on all three of its claims against the Defendants.

The Court finds Dakota Access has a strong likelihood of success on its claims against the Defendants. Based on the limited record before the Court, it appears that Dakota Access has a clear legal right to construct the Pipeline. Dakota Access asserts it has obtained the necessary easements and rights of way to construct the Pipeline in North Dakota and the necessary federal, state, and local permits for the Oahe Crossing. Specifically, Dakota Access has obtained a Certificate of Corridor Compatibility and Route Permit from the North Dakota Public Service Commission, a Sovereign Land Permit from the North Dakota State Water Commission, and authorization from the United States Army Corps of Engineers pursuant to Nationwide Permit No. 12. See Docket No. 1, p. 4. It does not appear that the Defendants have any valid legal basis for interfering with Dakota Access' construction of the Pipeline. As the Court has found a strong likelihood of success on Dakota Access' claims, no further analysis is necessary at this point. See Nokota Horse Conservancy, 666 F. Supp. 2d at 1078-80 (finding sufficient likelihood of success

on the merits of one claim, without a need to undertake extensive review of other claims). The Court finds Dakota Access has shown the "success on the merits" *Dataphase* factor weighs strongly in favor of the issuance of a temporary restraining order.

### B. IRREPARABLE HARM

Dakota Access must establish there is a threat of irreparable harm if injunctive relief is not granted, and that such harm is not compensable by an award of money damages. Doe v. LaDue, 514 F. Supp. 2d 1131, 1135 (D. Minn. 2007). "The 'mere possibility' that harm may occur before a trial on the merits is not enough." MKB Mgmt. Corp. v. Burdick, 954 F. Supp. 2d 900, 912 (D.N.D. 2013). The party that seeks a temporary restraining order must show that a significant risk of harm exists. Id. The absence of such a showing is sufficient grounds to deny injunctive relief. Id.

Dakota Access contends it will suffer irreparable injury if the Defendants continue to interfere with its construction of the Pipeline. The Defendants seek to prevent Dakota Access from exercising its contractual and property rights to construct the Pipeline. The Defendants have no legal basis for doing so. If the Defendants are allowed to continue to obstruct Dakota Access from continuing its construction of the Pipeline, even temporarily, the Defendants will wrongfully strip Dakota Access of its right to engage in lawful construction of the Pipeline. The situation has escalated to the point where there have been threats of physical harm and use of force or violence to Dakota Access' employees and contractors and law enforcement officers, destruction of property, disregard for law enforcement officers' instructions and safety, and dangerous and unlawful behaviors which could lead to physical harm, including protestors throwing rocks and bottles at Dakota Access' vehicles while its employees and contractors attempt to leave the

construction site.  Physical harm would be unlawful and clearly irreparable.  See N.D.C.C. § 34-08-07 (permitting courts to restrain threatened or continued unlawful acts).  The affidavit filed by Dakota Access demonstrates that the threat of irreparable harm is very real.  See Docket No. 6.

The Court finds the threat of the Defendants' continued interference with Dakota Access' construction of the Pipeline is real and poses a significant threat of irreparable harm.  Further, the Eighth Circuit has explained that a district court can presume irreparable harm if the movant is likely to succeed on the merits.  See Calvin Klein Cosmetics Corp., 815 F.2d at 505 (citing Black Hills Jewelry Mfg. Co. v. Gold Rush, Inc., 633 F.2d 746, 753  (8th Cir. 1980)).  As Dakota Access has sufficiently demonstrated the threat of irreparable harm, the Court finds this *Dataphase* factor weighs strongly in favor of the issuance of a temporary restraining order.

### C.  BALANCE OF HARMS

As outlined above, Dakota Access has demonstrated the threat of irreparable harm.  The balance of harm factor requires consideration of the balance between the harm to the movant and the injury the injunction's issuance would inflict on other interested parties.  See Pottgen v. Mo. State High Sch. Activities Ass'n, 40 F.3d 926, 929 (8th Cir. 1994).  While the irreparable harm factor focuses on the harm or potential harm to the plaintiff, the balance of harm factor analysis examines the harm to all parties to the dispute and other interested parties, including the public. See Dataphase, 640 F.2d at 114; Glenwood Bridge, Inc. v. City of Minneapolis, 940 F.2d 367, 372 (8th Cir. 1991).

At this early stage, Dakota Access has clearly demonstrated a strong likelihood of success on the merits and a real threat of irreparable harm.  Based on the limited record before the Court, it does not appear that the temporary restraining order Dakota Access seeks will harm the

Defendants in any significant way.  The issuance of a temporary restraining order will merely prevent the Defendants from attempting to deter construction of the Pipeline by engaging in obstructionist and dangerous behavior.  It will not affect their right to peacefully protest such construction.  Even if the Defendants are able to demonstrate that they will suffer harm, such harm will likely be short-lived.  Pursuant to Rule 65 of the Federal Rules of Civil Procedure, when a court issues a temporary restraining order without notice, "the motion for a preliminary injunction must be set for hearing at the earliest possible time, taking precedence over all other matter . . . ."  Fed. R. Crim. P. 65(b)(3).  Additionally, typically the maximum amount of time that a temporary restraining order is in effect is 14 days.  See Fed. R. Crim. P. 65(b)(2).  If the *ex parte* temporary restraining order is not granted, Dakota Access will be forced to either abandon its planned construction of the Pipeline or continue its activities under threat of physical violence against its employees and contractors and potential corresponding liability for Dakota Access.  Under either of these scenarios, Dakota Access will be irreparably harmed.

The balance of harm factor clearly favors Dakota Access.  Given the relatively short time period and the potential for Dakota Access to suffer lengthy and costly delays resulting in significant harm, the Court finds the "balance of harm" *Dataphase* factor strongly weighs in favor of issuance of an *ex parte* temporary restraining order.

### D. PUBLIC INTEREST

The final *Dataphase* factor, which involves consideration of public policy, also favors the issuance of a temporary restraining order.  The North Dakota legislature has specifically declared that the development and production of oil and gas is in the public interest. N.D.C.C. § 38-08-01 (stating it is "in the public interest to foster, to encourage, and to promote the development,

11

production, and utilization of natural resources of oil and gas in the state"). Granting a temporary restraining order comports with this public interest. Public policy, as clearly stated in North Dakota law, favors the development of oil and gas resources. In addition, it is certainly in the public interest to protect companies and their employees and contractors from physical harm while engaged in lawful business activities and to prevent unlawful conduct. Therefore, at this preliminary stage, the Court finds this *Dataphase* factor weighs strongly in favor of the issuance of a temporary restraining order.

After a careful review of the entire record and the *Dataphase* factors, the Court finds Dakota Access has met its burden under Rule 65(b) of establishing the necessity of an *ex parte* temporary restraining order.

## IV.  CONCLUSION

The Court has carefully reviewed the entire record and the *Dataphase* factors and finds the Plaintiff has met its burden under Rule 65(b) of establishing the necessity of an *ex parte* temporary restraining order. The Court **GRANTS** the motion for a temporary restraining order (Docket No. 3). As a result, the Defendants and any person or entities acting in concert with or on behalf of the Defendants, are **TEMPORARILY RESTRAINED AND ENJOINED** from unlawfully interfering in any way with the Plaintiff and its representatives' access and construction of the Pipeline. Lawful assembly and peaceful protest is the hallmark of our democracy; however, threats of physical harm or violence and criminal activity is unacceptable.

In addition, the Court **ORDERS** the following:

1) A hearing will be held in Eagle Courtroom of the U.S. District Court for the District of North Dakota, in Bismarck, North Dakota, on **Thursday, August**

        **25, 2016, at 2:30 p.m.** to determine whether a preliminary injunction should be issued.

2)     At the hearing, the Plaintiff shall be prepared to show cause why a preliminary injunction should be issued. If the Plaintiff fails to do so, "the court must dissolve the [restraining] order." Fed.R.Civ.P. 65(b)(3).

3)     At the hearing, the Defendants shall be prepared to show cause why they should not be preliminarily enjoined during the pendency of this action.

4)     At any time, the Defendants may file a motion to dissolve or modify this temporary restraining order in accordance with Rule 65(b)(4) of the Federal Rules of Civil Procedure. The Defendants may also contact the U.S. District Court to modify the time or date of the scheduled hearing.

5)     The temporary restraining order will not become effective until the Plaintiff serves the order on the named Defendants. The Plaintiff shall arrange for the immediate service of this order together with the Plaintiff's motion for a temporary restraining order and the supporting pleadings and affidavits, and shall promptly file proof of service with the Court. The Plaintiff shall also conspicuously publish a copy of Section IV (Conclusion) of this order in the Bismarck Tribune newspaper for three (3) consecutive days and shall provide a copy to be published on the Standing Rock Tribe's website (standingrock.org) as soon as reasonably practicable. The Plaintiff has stated it will distribute copies of the temporary restraining order, if granted, to protestors present at the construction site so they are on notice of the Court's order. The Court requires the Plaintiff to do so.

6)     In accordance with Rule 65(c) of the Federal Rules of Civil Procedure, a $10,000 bond shall be required to be posted by the Plaintiff before the temporary restraining order is effective.

7)     In accordance with Rule 65(b)(2) of the Federal Rules of Civil Procedure, this order expires in 14 days or on or before August 30, 2016, at the same hour of this order, unless the Court, for good cause, extends the order "for a like period or the adverse party consents to a longer extension."

**IT IS SO ORDERED**.

Dated at 10:20 a.m., this 16th day of August, 2016.

                                            */s/ Daniel L. Hovland*
                                            Daniel L. Hovland, District Judge
                                            United States District Court