## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| Dakota Access, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **ORDER CANCELLING HEARING** |
| vs. | ) | **AND DISSOLVING TEMPORARY** |
| | ) | **RESTRAINING ORDER** |
| Dave Archambault, II, Jonathan Edwards, | ) | |
| Dana Yellow Fat, Valerie Dawn | ) | Case No.: 1:16-cv-296 |
| Wolf Necklace, Clifton Verle Hollow, | ) | |
| Donald Dennis Strickland, Aaron | ) | |
| Gabriel Neyer, and John & Jane Does, | ) | |
| | ) | |
| Defendants. | ) | |

On August 15, 2016, Plaintiff Dakota Access, LLC ("Dakota Access") filed an *ex parte* Motion for Temporary Restraining Order. See Docket No. 3. On August 16, 2016, the Court granted the motion. See Docket No. 7. A show cause hearing was initially scheduled for August 25, 2016. See Docket No. 8. By stipulation of the parties, the hearing was rescheduled for September 8, 2016, and then again rescheduled for September 20, 2016, to determine whether a preliminary injunction should be issued. See Docket Nos. 13, 14 and 33. On September 12, 2016, Defendant Jonathan Edwards filed a motion to dissolve the temporary restraining order. See Docket No. 35. Defendants Valerie Wolf Necklace and Clifton Verle Hollow filed a joint motion to dissolve the temporary restraining order on September 14, 2016. See Docket No. 37. Defendants Dave Archambault II and Dana Yellow Fat filed a motion to dissolve the temporary restraining order on September 15, 2016. See Docket No. 43. For the reasons set forth below, the motions to dissolve the temporary restraining order are granted. Although the time period for a response from Dakota Access has not yet expired, the Court *sua sponte* concludes the TRO should be dissolved.

1

I.      **BACKGROUND**

The Plaintiff, Dakota Access, LLC ("Dakota Access"), is a Delaware limited liability company that is authorized to do business in North Dakota. See Docket No. 1.  Dakota Access maintains no member of Dakota Access is a citizen of North Dakota, South Dakota, Maryland, or Ohio.  Dakota Access is engaged in the business of constructing the Dakota Access Pipeline (the "Pipeline") in North Dakota and specifically, for the Pipeline to cross the Missouri River and Lake Oahe (the "Oahe Crossing").  The Pipeline is an approximately 1,154-mile-long crude oil pipeline stretching from North Dakota to existing pipeline infrastructure near Patoka, Illinois.  The estimated total cost for the Pipeline's construction is $3.7 billion.  The named Defendants are citizens of North Dakota, South Dakota, Maryland, and Ohio who are protesting the Pipeline's construction.  See Docket No. 1, pp. 1-2.

On August 15, 2016, Dakota Access filed a complaint in federal court, asserting claims of declaratory judgment, injunctive relief, and civil trespass, and requested a temporary restraining order.  See Docket Nos. 1 and 3.  Dakota Access filed the lawsuit against seven Defendants in response to protests against the Pipeline which took place in Morton County, North Dakota, on August 10-12, 2016.  Those protests resulted in the arrest of a large number of individuals on a variety of misdemeanor charges ranging from trespassing to assault, and included the named Defendants in this case.  The Court issued a temporary restraining order on August 16, 2016, which prohibited the Defendants from "unlawfully interfering in any way with the Plaintiff and its representatives' access and construction of the Pipeline."  See Docket No. 7, p. 12.

Since the Court issued its temporary restraining order, the protests have grown much larger and significantly more arrests have occurred in state court in Morton County.  In addition, an attempt to enjoin the construction of the Pipeline under the Missouri River has failed.  Standing Rock Sioux

Tribe v. U.S. Army Corps of Engineers, No. 16-1534 (D. D.C. Sept. 9, 2016).  Political forces have

also weighed in on the controversy over the Pipeline and expressed an unwillingness to allow the

project to go forward at this point.  See Docket No. 39-1.

The Defendants have asserted a litany of factual and legal arguments in support of their

motions to dissolve the temporary restraining order ("TRO").  The Defendants have said the protest

movement has been essentially a "large and peaceful Native-led protest movement."  See Docket

No. 38, p. 4.  They have contended the TRO has had a chilling effect on the exercise of First

Amendment rights, and the TRO has improperly chilled the rights of the Defendants to engage in

the protected exercise of their constitutional rights.  See Docket No. 44, p. 12.  The Court has been

informed on several occasions by defense counsel that each day the TRO remains in effect their

clients' First Amendment rights are "chilled."

With respect to the  assertion the movement has been a peaceful protest, one need only turn

on a television set or read any newspaper in North Dakota.  There the viewer will find countless

videos and photographs of the "peaceful" protestors attaching themselves to construction equipment

operated by Dakota Access; vandalizing and defacing construction equipment; trespassing on

privately-owned property; obstructing work on the pipeline; and verbally taunting, harassing, and

showing disrespect to members of the law enforcement community.  The State of North Dakota has

estimated the cost for law enforcement services to date at $2 million dollars.  The estimated damage

to construction equipment and loss of work on the project is far in excess of several million dollars.

The Morton County Sheriff reported that 22 protestors were arrested on September 13, 2016, just

a few days ago.  To suggest that all of the protest activities to date have been "peaceful" and law-

abiding defies common sense and reality.  Nearly every day the citizens of North Dakota are

inundated with images of "peaceful" protestors engaging in mindless and senseless criminal

mayhem.

The Court fully recognizes the unlawful and violent protestors arrested to date constitute a very small percentage of the entire entourage. The Court also recognizes that many of the troublesome "peaceful protestors" are from out-of-state who have political interests in the pipeline protest and hidden agendas vastly different and far removed from the legitimate interests of Native Americans of the Standing Rock Sioux Tribe who are actually impacted by the pipeline project. But for anyone to suggest the protests have been entirely peaceful and prayerful is less than forthright and ludicrous at best.

As to the suggestion by defense counsel that each day the TRO remains in effect has a serious "chilling effect" on the Defendants' First Amendment rights, the Court notes the TRO only enjoined the unlawful interference with access to and the construction of the pipeline - nothing more. See Docket No. 7. In essence, it was simply an "obey-the-law" injunction. The TRO explicitly noted the Defendants would always be allowed to engage in lawful assembly and peaceful protest, but that threats of violence, physical harm, and criminal activity were unwarranted and prohibited.

There is no reliable or credible evidence in the record to establish that any individual's First Amendment rights have been "chilled" to date. To the contrary, the named Defendants have been physically and vocally present at numerous protests and demonstrations in North Dakota and elsewhere over the past month. There are named Defendants who have continually voiced their objections to the Dakota Access pipeline project in local, regional, and national news media, including a lengthy op-ed submitted by Defendant Archambault and published in the *New York Times* on August 24, 2016, entitled "Taking a Stand at Standing Rock." To suggest the TRO has resulted in a "chill" of the Defendants' constitutional rights certainly plays well in the press, but it

4

is devoid of any reason or common sense.  All of the Defendants have been permitted to engage in

peaceful protests and lawful assembly which they have unquestionably been doing since long before

the TRO was issued, and have continued to do so thereafter.  Nevertheless, the Defendants have

raised some legitimate  concerns relative to the TRO which the Court has carefully considered along

with the *Dataphase* factors.


II.      **LEGAL DISCUSSION**

It is well-established that the movant has the burden of establishing the necessity of a

temporary restraining order or a preliminary injunction.  Baker Elec. Coop., Inc. v. Chaske, 28 F.3d

1466, 1472 (8th Cir. 1994).  "No single factor in itself is dispositive; in each case all of the factors

must be considered to determine whether on balance they weigh towards granting the injunction."

Id. at 1472.  Rule 65(b) directs the court to look to the specific facts shown by an affidavit to

determine whether immediate and irreparable injury, loss, or damage will result to the applicant.

In addition, it is well-established the court is required to consider the factors set forth in Dataphase

Systems, Inc., v. C L Systems, Inc., 640 F.2d 109, 114 (8th Cir. 1981), in determining whether a

temporary restraining order should be granted.  The *Dataphase* factors include "(1) the threat of

irreparable harm to the movant; (2) the state of balance between this harm and the injury that

granting the injunction will inflict on other parties litigant; (3) the probability that movant will

succeed on the merits; and (4) the public interest."  Id.

The motions to dissolve the temporary restraining order have caused the Court to carefully

reexamine the *Dataphase* factors since the order was granted on a *ex parte* basis and without the

benefit of a developed record.  Suffice it to say, the posture of this controversy has changed

dramatically in the last thirty (30) days.  It is clear that while the pipeline demonstrators have the

right to protest, they certainly have no right to violate the law or commit illegal and unlawful acts while exercising their First Amendment rights.  It is equally clear that law enforcement officials have arrested, and will continue to arrest and prosecute, those protestors who have allegedly committed criminal acts.

In denying requests to enjoin unlawful activity, courts have long relied on the legal maxim that equity will not enjoin the commission of a crime.  See United States v. Dixon, 509 U.S. 688, 694-95 (1993) (noting the long common law tradition against judicial orders enjoining violations of the law); see also United States v. Santee Sioux Tribe of Neb., 135 F.3d 558, 565 (8th Cir. 1998) (stating "equity generally will not enjoin the commission of a crime").  The United States Supreme Court explained in *Dixon* that "[t]he interest protected by the criminal or civil prohibition was to be vindicated at law--and though equity might enjoin harmful acts that happened to violate civil or criminal law, it would not enjoin violation of civil or criminal law as such."  Dixon, 509 U.S. at 695; see also Swift & Co. v. United States, 196 U.S. 375, 396 (1905) ("We cannot issue a general injunction against all possible breaches of the law."); NLRB v. Express Pub. Co., 312 U.S. 426, 435-436 (1941) ("the mere fact that a court has found that a defendant has committed an act in violation of a statute does not justify an injunction broadly to obey the statute and thus subject the defendant to contempt proceedings if he shall at any time in the future commit some new violation.").  As one learned treatise explained, the justifications for the maxim are a desire to protect the accuseds' right to the safeguards of criminal procedure and the adequacy of the criminal justice system to protect the interests of a plaintiff.  11A Charles Alan Wright et al., Federal Practice and Procedure, § 2942 (3d ed. 2013).

It is clear the criminal justice system is currently addressing, and will continue to address, the mindless and senseless criminal activity of the hooligans that choose to accompany the protest

movement.  Scores of protestors have been arrested since the Court issued its temporary retraining order one month ago.  To continue to enjoin criminal misconduct in this civil action, under pain of a contempt sanction, would serve no legitimate purpose.  Enjoining a crime is superfluous as all persons are enjoined by the commands of our criminal laws. All persons are expected to live in accordance with local, state, federal, and tribal laws, and to conduct themselves in a civil, respectful, and law-abiding manner.  Under these circumstances, the Court finds the *Dataphase* factors no longer favor Dakota Access' motion and good cause no longer exists to keep the temporary restraining order in place. The named Defendants are currently being dealt with in the criminal justice system.

## III.   CONCLUSION

Accordingly, the motions to dissolve the temporary restraining order (Docket Nos. 35, 37, and 43) are **GRANTED**, the temporary restraining order is **DISSOLVED**, and the hearing scheduled for September 20, 2016, is **CANCELLED**.  The motion for judicial notice (Docket No. 39) is **DENIED** as moot.  The $10,000 bond posted by the Plaintiff pursuant to the Court's Order Granting a Temporary Restraining Order filed on August 16, 2016, is released.  The Clerk of Court is directed to return the bond in accordance with D.N.D. Gen. L. R. 1.10(C)(1).

**IT IS SO ORDERED**.

Dated this 16th day of September, 2016.

*/s/ Daniel L. Hovland*
Daniel L. Hovland, District Judge
United States District Court